UNITED STATES of America, Plaintiff–Appellee,

v.

**Ronald Berry WASHINGTON, Defendant–Appellant.**

No. 02–10526.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 2003.

Filed Nov. 2, 2004.

Cynthia S. Hahn (argued and briefed) and Michael K. Powell (briefed), Assistant Federal Public Defenders, Reno, NV, for the defendant-appellant.

Craig Denney, Assistant United States Attorney, Reno, NV, for the plaintiff-appellee.

Before: PREGERSON, BEAM,* and PAEZ, Circuit Judges.

PREGERSON, Circuit Judge:

The district court denied Ronald Berry Washington's motion to suppress evidence that Reno Police Department ("RPD") officers obtained during a search of Washing-

---

* The Honorable C. Arlen Beam, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

ton's residential hotel room. Washington appeals. Washington contends that the officers repeatedly violated his Fourth Amendment rights; that his written consent to search his room was coerced; and that, even if not coerced, the consent itself and the evidence obtained pursuant to the consent were tainted by the officers' violations of his Fourth Amendment rights. We agree with Washington that the officers repeatedly violated his Fourth Amendment rights and that both Washington's written consent and the evidence obtained pursuant to it were tainted. Accordingly, as explained in greater detail below, we reverse the district court's denial of Washington's motion to suppress.

## I. FACTUAL BACKGROUND [1]

On February 25, 2001, RPD officers received a tip that an individual named "Shane" was operating an active methamphetamine laboratory in Room 319 of the Comstock Hotel (the "Comstock")—a hotel converted into residential apartments—and that occupants of an unidentified room on the fifteenth floor were also involved in manufacturing and/or distributing methamphetamine.

RPD Officer Robert Tygard learned from the Comstock's desk clerk that Room 319 was vacant because its former occupant, Shane Leffingwell, had been evicted. In response to questions about possible methamphetamine sales taking place on the fifteenth floor, the desk clerk told Tygard that Room 1524 received a "large number of telephone calls" and that there

was heavy "foot traffic" on the fifteenth floor.

Officer Tygard learned that Defendant Washington was the occupant of Room 1524 and that he had prior convictions for unlawful use of a controlled substance, carrying a concealed weapon, obstructing police officers, and giving false information to a police officer. At approximately 8:30 p.m., Tygard returned to the Comstock in uniform with four other uniformed RPD officers—Officers Sceirine, Soto, Mandagaran, and Sergeant Partyka—and one plain-clothed RPD officer—Detective Brian Chittenden. The six officers went to Room 1524 to conduct a "knock and talk," [2] with a view to questioning Washington about whether he was involved in manufacturing and/or distributing methamphetamine. Upon their arrival on the fifteenth floor, three of the six officers approached Washington's door. According to Officer Sceirine's testimony at the suppression hearing, the remaining three officers hid five to ten feet down the hallway "to eliminate the coercion defense," should Washington later assert that he was coerced into opening his door. Sceirine also admitted at the suppression hearing that before speaking with Washington, "there was no probable cause to get a search warrant for [Washington's] room."

Responding to Officer Sceirine's knock, Washington opened the door, exited his room, entered the hotel hallway, and closed the door behind him. When Washington exited his room, he could see all six

---

1. The following facts are undisputed unless otherwise noted.

2. We have described a "knock and talk" in the following terms:

Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of

privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant there of whether the questioner be a pollster, a salesman, or an officer of the law.

*United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir.2000) (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964)).

officers, five of whom carried visible firearms. Sceirine testified that when the officers started talking to Washington, all six were "around" him.

Shortly after Washington entered the hallway, Sceirine reminded Washington that previously he had been arrested for carrying a concealed weapon and that he had not registered with the RPD—in Sceirine's words, "a misdemeanor, arrestable charge." [3] Sceirine also requested that Washington submit to a pat-down search for weapons. Washington complied, and the search revealed no weapons or evidence of drug-related activity.

The six officers walked Washington twenty to thirty feet down the hallway and away from his door. While in the hallway, Sergeant Partyka realized that someone else was in Washington's room. Officer Sceirine called for that individual to exit and, while waiting for him to do so, again reminded Washington that his failure to register with the RPD was an "arrestable charge."

Pursuant to Officer Sceirine's request, Leo "Libo" Nolan exited Washington's room, leaving the door open. Washington asked Nolan to "please close the door," but Officers Soto and Sceirine responded that they "d[id not] like leaving this door closed" and refused to let Nolan close it. Officer Sceirine testified that, with the door open, the officers "had a fairly ample view of the room," which was studio—or hotel-style with one main room and an adjacent bathroom.

For a third time, Officer Sceirine reminded Washington that he had failed to register with RPD and that his failure to do so was "an arrestable charge." Sceirine then questioned Washington about whether Washington had a methamphetamine lab in his room and whether he was selling drugs. Washington emphatically and unequivocally denied that he was running a methamphetamine lab in his room and/or involved in methamphetamine distribution.

Still in the hallway, Officer Sceirine asked Washington to cooperate and explained that the officers wanted his consent to search:

> Well, here's what we want to do. We wanna ... usually with us, we want to avoid this being a long drawn out investigation. Do you hear what I'm saying? And that's why we're contacting you and we're doing this in such a manner, for your cooperation, to make sure there's no lab in there, for your permission to search for anything that would have any relationship to a lab. OK?

Washington responded, "Uh, sure." Sceirine claimed at the suppression hearing that Washington's response communicated his first consent to search his room.[4]

After further conversation, Officer Sceirine again suggested that Washington let

---

**3.** Officer Sceirine admitted at the suppression hearing that he was "conveying to Washington ... that [he] could arrest him at that point."

From this point forward, we know exactly what the officers and Washington said to each other because Officer Sceirine activated a pocket-sized tape recorder to record the officers' encounter with Washington. The audiotape and accompanying transcript of the conversation were admitted into evidence and the audio tape was played at the suppression hearing.

**4.** The district court concluded that Washington did not consent to a search when he responded "Uh, sure" because his statement was insufficiently clear, positive, and intelligent. In the district court's view, Washington's statement was likely an acknowledgment of Officer Sceirine's stated purpose for contacting him at his room—*viz.*, "to make sure there's no lab in there." The Government does not challenge this finding on appeal.

the officers just "go inside and talk." Washington did not respond with a "yes" or a "no" answer, but instead asked, "can my wife get here first?" Almost immediately thereafter, Sceirine—still outside but able to see into the room—asked, "Is that a gun on the bed?" Washington responded, "No sir.... That's a pager." Sceirine then suggested, "OK, well let[']s go." Washington responded, "OK." Sceirine and Detective Chittenden claimed that this response communicated Washington's second consent to a search of his room.[5]

According to Officer Sceirine, he and Detective Chittenden entered Washington's room and directed Washington to sit on the bed while Sergeant Partyka stood in the doorway.[6] Sceirine also admitted that, by the time he and Chittenden were inside Washington's room, Washington was not free to leave or to otherwise terminate the encounter.

The officers resumed questioning Washington about his involvement in drug trafficking and his connection to Leffingwell, the former occupant of Room 319. In particular, Detective Chittenden asked Washington whether he had anything unlawful in his room. Washington admitted that he possessed a line of methamphetamine and indicated its general location.[7] Detective Chittenden further questioned Washington about being involved in methamphetamine production and/or distribution. Washington again unequivocally denied any involvement. Sometime during this exchange, an officer moved Washington's coat and discovered Washington's line of methamphetamine.

Officer Sceirine then placed a permission to search form in front of Washington and asked him to sign the bottom section of the form:

This is a permission to search, OK? And like I said, I explained to you why we're here and what we're looking for. You already got ... some evidence of some dope here. What we want to do is avoid taking the time to apply for a search warrant and go along with your cooperativeness and this permission to search and bang it out real quick. That's what we're looking for here. Permission to search....

Washington refused to sign the form and protested, "I don't have anything here, you can see that." Officer Sceirine admitted at the suppression hearing that, at that point, he had observed no methamphetamine lab instrumentalities—e.g., glassware, tubing, venting mechanisms, jars of red phosphorous, or hot plates—in Washington's room. Sceirine again requested that Washington sign the form: "So can we get your permission to search here? Just sign right here, this is your name right here. All this is, is a permission to search nothing else." At that point, Washington signed the form. The permission to

---

5. Again, the district court concluded that Washington did not consent to search when he responded "OK" because his statement was insufficiently clear, positive, and intelligent. In particular, the district court found significant that Washington's statement was not in response to a clear request to search his room. The Government does not challenge this finding on appeal either.

6. In contrast to Officer Sceirine's testimony, Detective Chittenden and Officer Tygard testified that five of the six officers entered Washington's room. The district court credited

Sceirine's version of the events over Chittenden's and Tygard's.

7. "Within the drug culture, 'doing a line' means segregating a small pile of powdered drugs, typically cocaine or methamphetamine into lines approximately one to two inches long. Typically a razor blade, credit card, or other like object is used to form the 'line' and the user will snort the substance through the nostrils with a straw or other cylindrical object." *United States v. Cravens*, 56 M.J. 370, 372 (C.A.A.F.2002).

search form was signed at 8:45 p.m., approximately fifteen minutes after the officers returned to the Comstock.

During the ensuing search, Detective Chittenden discovered a handgun. The officers questioned Washington about the gun and continued to probe him about whether he had been operating a methamphetamine lab in his room. Washington again denied any involvement in manufacturing and/or distributing methamphetamine but confessed to owning the gun.

## II. PROCEDURAL HISTORY

On April 25, 2001, Washington was charged in a one-count indictment with being a felon in possession of a firearm, 18 U.S.C. §§ 922(g)(1), 924(a)(2). Washington moved to suppress the handgun recovered by the officers and his confession that he owned it. On May 21, 2002, the district court held an evidentiary hearing on Washington's motion to suppress.

The following day, the district court denied Washington's motion to suppress. The district court analyzed Washington's encounter with the RPD officers as a *"Terry*-stop" under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The district court concluded that, taken together, (1) the tip that occupants of an unidentified room on the fifteenth floor were involved in manufacturing and/or distributing methamphetamine; (2) the Comstock desk clerk's statement that room 1524 received a "large number of telephone calls" and that there was heavy "foot traffic" on the fifteenth floor; and (3) Washington's prior convictions for unlawful use of a controlled substance and carrying a concealed weapon, gave the officers "a founded suspicion or reasonable suspicion to detain [Washington] ... and question him about what was going on in the room." The district court also concluded, however, that Washington's first two purported oral consents to search his room were invalid be-

cause Washington's statements were insufficiently clear, positive, and intelligent and that the officers' entry into Washington's room was, therefore, unconstitutional. Nevertheless, the district court found that, under *Terry*, the officers retained the right to detain Washington *in* his room—their prior unconstitutional conduct notwithstanding—and that Washington's written consent was voluntary and purged any taint caused by the officers' violations of his constitutional rights.

On June 11, 2002, Washington entered a conditional guilty plea, reserving his right to appeal the district court's denial of his motion to suppress. This timely appeal followed.

## III. DISCUSSION

### A. Standard of Review

We review a district court's ruling on a motion to suppress *de novo* and its underlying factual findings for clear error. *See United States v. Fernandez–Castillo*, 324 F.3d 1114, 1117(9th Cir.2003).

### B. Analysis

#### 1. *Washington's Detention in the Hallway Outside His Room*

Because the district court analogized Washington's encounter with the six RPD officers to a *Terry*-stop, and because Washington argues that the officers first violated his Fourth Amendment rights when they unconstitutionally seized him in the hallway outside of his room, our analysis necessarily begins with a discussion of *Terry* and Washington's encounter with the six RPD officers in the hallway outside of his room.

In *Terry,* a police officer became suspicious of two men standing on a street corner in a downtown area. *See* 392 U.S. at 5, 88 S.Ct. 1868. While being observed by the officer, one of the men walked up

the street, peered into a store, walked on, turned around, looked into the same store again, and then joined his companion and began speaking with him. *See id.* at 6, 88 S.Ct. 1868. Both men individually repeated this ritual, until, between them, they had done so approximately a dozen times. *See id.* The two men then began speaking with a third man and, about ten minutes after the third man's departure, headed up the street in his direction. *See id.* The officer, concerned that the three men were "casing" the store for a possible armed robbery, followed and confronted them. *See id.* at 6–7, 88 S.Ct. 1868. The officer identified himself and asked the men their names, but they only "mumbled" inarticulable responses. *See id.* at 7, 88 S.Ct. 1868. The officer then spun one of the men (Terry) around and patted his breast pocket. *See id.* The pat-down revealed a pistol. *See id.* A pat-down of the second man also revealed a pistol. *See id.* The officer's frisk of the third man revealed nothing, and he was not searched any further. *See id.* Terry was charged with carrying a concealed weapon and moved to suppress the recovered pistol as the product of an unconstitutional search. *See id.* at 7–8, 88 S.Ct. 1868. The Supreme Court upheld the trial court's denial of Terry's motion to suppress, finding that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover

weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. 1868. After the Supreme Court's approval of the officer's brief, "carefully limited," and public search of the three suspects, courts began referring to such encounters as "*Terry*-stops." *See, e.g., United States v. Burrell,* 286 A.2d 845, 852 (D.C.1972) (Gallagher, J., dissenting) (referring, for the first time in a published opinion, to a "*Terry*-stop").

Since the Supreme Court decided *Terry,* it has expanded the scope of a permissible *Terry*-stop from simply conducting a weapons pat-down to "ask[ing] the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The Court has also expanded *Terry* to allow officers to effect a *Terry*-stop of a vehicle on a public roadway. *See Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (comparing being on foot on public sidewalks to being in an automobile on public roadways). But it has never expanded *Terry* to allow a *Terry*-stop at an individual's home.

Indeed, *Terry's* twin rationales for a brief investigatory detention—the evasive nature of the activities police observe on the street and the limited nature of the intrusion, *see* 392 U.S. at 20–26, 88 S.Ct. 1868—appear to be inapplicable to an encounter at a suspect's home. Officers on the beat may lose a suspect before the officers have gathered enough information to have probable cause for an arrest. In contrast, officers who know where a suspect lives have the opportunity to investigate until they develop probable cause, all the while knowing where to find the suspect. Because "[n]owhere is the protective force of the fourth amendment more pow-

erful than [within] the sanctity of the home," *United States v. Albrektsen,* 151 F.3d 951, 953 (9th Cir.1998), the second rationale for a *Terry*-stop seems almost absent by definition when the intrusion is at a suspect's home.[8] Nonetheless, we need not decide the purely legal question whether police officers may constitutionally conduct a *Terry*-stop at an individual's home or whether the RPD officers in this case would have had reasonable suspicion to do so because we find that the officers' encounter with Washington exceeded the limits of any permissible detention under the Fourth Amendment.

a. Whether Washington Was Seized

■ A seizure occurs when a law enforcement officer, through coercion, "physical force[,] or a show of authority, in some way restricts the liberty of a person." *United States v. Chan–Jimenez,* 125 F.3d 1324, 1325 (9th Cir.1997). A person's liberty is restrained when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Michigan v. Chesternut,* 486 U.S.

567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), and citing *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).

■ In *Orhorhaghe v. INS,* 38 F.3d 488 (9th Cir.1994), we identified five factors that aid in determining whether a reasonable person would have felt "at liberty to ignore the police presence and go about his business." *Id.* at 494 (quoting *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382). These factors are: (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or nonpublic setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter. *Id.* at 494–96, 111 S.Ct. 2382.

■ In this case, Washington was confronted by six officers, five of whom were uniformed and visibly carrying weapons, and all six of whom—in Officer Sceirine's words—were "around" him. Like the encounter in *Orhorhaghe,* Washington's encounter with the six RPD officers began in the "hallway of his apartment building— private property shielded from the view of the vast majority of the public" and contin-

---

**8.** We have repeatedly held that an intrusion *into* someone's home may not be premised on *Terry's* reasonable suspicion standard. *See LaLonde v. County of Riverside,* 204 F.3d 947, 953–54 (9th Cir.2000) ("The reasons that gave rise to the rule in *Terry* are simply not applicable to a warrantless entry to seize a person within his home."); *United States v. Winsor,* 846 F.2d 1569, 1577–78 (9th Cir.1988) (en banc) (rejecting the proposition that *Terry's* reduced Fourth Amendment standards can be applied to a warrantless entry to search for property within the home, even when the search involves a highly limited intrusion); *see also Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (specifically reversing the state court ruling which had relied on the premise that a war-

rantless entry to seize a person within a home can be held to *Terry's* lower Fourth Amendment standard); *United States v. Johnson,* 170 F.3d 708, 714 (7th Cir.1999) ("No decision of the Supreme Court ... has ever held that the police may conduct a *Terry* 'frisk' of a house or an apartment—that is, approach it on nothing but a suspicion that something is amiss and conduct a brief warrantless search."); *United States v. Conner,* 127 F.3d 663, 666 n. 3 (8th Cir.1997) ("[I]f the police could demand entry into a person's home or hotel room to investigate suspected criminal activity in situations where they lack a warrant or even probable cause to search or arrest, the Fourth Amendment rule would be swallowed by the *Terry* exception.").

ued into Washington's one-room residence. *Id.* at 495. The six officers moved Washington twenty to thirty feet away from his door, refused to heed Washington's request to shut the door to his own residence, and thrice repeated that Washington faced an arrestable charge of failing to register with the RPD. Moreover, by Officer Sceirine's own admission, he repeatedly admonished Washington about the arrestable charge to convey to Washington that he could be arrested if he did not cooperate and that he was not free to terminate the encounter. Finally, the officers never notified Washington that he had a right to refuse to answer their questions and to terminate the encounter. Taking into account all of these circumstances, we conclude that Washington was seized when he was confronted by six officers. A reasonable person in his position would not have felt "at liberty to ignore the police presence and go about his business." *Id.* at 494.

Our analysis of whether Washington was *unconstitutionally* seized does not end there, however; *Orhorhaghe* only answers the question whether Washington was seized—not whether his seizure was unconstitutional.

b. Whether Washington's Seizure Was Unconstitutional

 A seizure premised on reasonable suspicion, such as a *Terry*-stop, is not *per se* unconstitutional under the Fourth Amendment, so long as it is sufficiently brief and minimally intrusive. *See United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (examining, under *Terry*, "whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion"). Here, Washington's detention by the six RPD officers violated the Fourth Amendment because it was *not* sufficiently brief and *not* minimally intrusive.

In *United States v. Miles*, [247 F.3d 1009, 1012 (9th Cir.2001),] we described the test for determining when a *Terry*-stop becomes an arrest: whether the detention exceeded "a brief stop, interrogation and, under proper circumstances, a brief check for weapons." Then, "if the stop proceeds beyond these limitations," ... "an arrest occurs ... if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning." *United States v. Bravo*, 295 F.3d 1002, 1011 n. 8 (9th Cir.2002) (quoting *Miles*, 247 F.3d at 1012).

 After Washington left his room and entered the hallway, he voluntarily consented to Officer Sceirine's request for "a brief check for weapons." *Id.* (quoting *Miles*, 247 F.3d at 1012). The pat-down revealed no weapons or evidence of drug manufacturing or distribution. Officer Sceirine then asked Washington whether he had a methamphetamine lab in his room and whether he was selling drugs. Washington emphatically and unequivocally denied that he was running a methamphetamine lab in his room or involved in methamphetamine distribution. The officers' encounter with Washington should have ended there, but it did not. *See Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir.2003) ("A seizure becomes unlawful when it is 'more intrusive than necessary.' The scope of a detention 'must be carefully tailored to its underlying justification.'" (quoting *Florida v. Royer*, 460 U.S. 491, 500, 504, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983))). Instead, the officers continued to press Washington into allowing them to enter his room and, notwithstanding their failure to obtain permission to do so, entered it in violation of the Fourth Amendment.[9]

---

**9.** See discussion at, *infra,* Part III(B)(3).

The officers' "underlying justification" for initially detaining Washington was to question him about whether he was involved in producing and/or distributing methamphetamine. *See id.* But the officers' extended detention of Washington was "more intrusive than necessary" because the officers' actions—in particular, their repeated attempts to gain entry into Washington's room—were not "carefully tailored" to the detention's "underlying justification." *Id.* Rather, we find that the officers' actions were calculated to circumvent the Fourth Amendment's requirement that a warrant be obtained to search an individual's home. *See Lalonde,* 204 F.3d at 954 ("The Fourth Amendment prohibits police officers from making a warrantless entry into a person's home, unless the officers have probable cause and are presented with exigent circumstances." (citing *Payton,* 445 U.S. at 590, 100 S.Ct. 1371; *United States v. Prescott,* 581 F.2d 1343, 1350 (9th Cir.1978))). Thus, the officer's extended seizure of Washington was beyond the scope of any permissible detention under the Fourth Amendment.

### 2. The Officer's Unconstitutional Visual Search of Washington's Room

Washington also claims that the six RPD officers unconstitutionally gained visual access to his room when they required that the door to his room be left open. Officer Sceirine admitted that he and the other officers approached Washington's room without probable cause to search it. After Washington's friend, Nolan, exited the room, the officers refused to let Nolan close the door after Washington asked him to do so. Officer Sceirine testified that, with the door open, the officers "had a fairly ample view of the room."

■■ It "is clearly established Federal law" that police officers may only gain visual access to a hotel room if (1) the room's occupant voluntarily opens the hotel room door in response to a request (but not a threat or a command), (2) the officers have a warrant, or (3) the officers have probable cause and one of the exceptions to the warrant requirement exists.[10] *Bailey v. Newland,* 263 F.3d 1022, 1030–31, 1033 (9th Cir.2001); *see also Winsor,* 846 F.2d at 1573–74 (holding "that the police did effect a 'search' when they gained visual entry into the room through the door that was opened at their command," which the officers needed probable cause to justify). Whether a hotel room door is opened in response to a threat or a command or is kept open against the wishes of the room's occupant, police officers obtain visual access to the room by using their power to *require* that the door *be* open. Both scenarios result in a search within the meaning of the Fourth Amendment, and both scenarios require consent, a warrant, or probable cause plus an exception to the warrant requirement. Here, the officers possessed none of these legal grounds for gaining visual access to Washington's room. Thus, the officers violated Washington's Fourth Amendment rights when

**10.** "As a general rule, to satisfy the Fourth Amendment a search of a home must be supported by probable cause, and there must be a warrant authorizing the search.... Even when probable cause is shown, a warrantless search will normally be invalid unless there are 'exigent circumstances' that justify proceeding without a warrant." *United States v. Brooks,* 367 F.3d 1128, 1133 (9th Cir.2004) (citing *Nathanson v. United States,* 290 U.S. 41, 47, 54 S.Ct. 11, 78 L.Ed. 159 (1933)). " '[E]xigent circumstances,' include the need to protect an officer or the public from danger, the need to avoid the imminent destruction of evidence, when entry in 'hot pursuit' is necessary to prevent a criminal suspect's escape, and to respond to fires or other emergencies.' " *Id.* at 1133 n. 5 (citations omitted).

they gained visual access to his room by refusing to let Nolan close its door.

### 3. The Officers' Unconstitutional Entry into Washington's Room

The district court found that Washington's responses to Officer Sceirine's two verbal requests to enter Washington's room were *not* statements of consent to enter or to search it. Thus, the district court also found that the RPD officers entered Washington's room in violation of the Fourth Amendment. The Government does not challenge any of these findings on appeal, even though it was free to do so. *See, e.g., Engleson v. Burlington N.R.R. Co.,* 972 F.2d 1038, 1041(9th Cir.1992) (" '[A]rguments that support the judgment as entered can be made' ... even where the argument being raised has been explicitly rejected by the district court." (quoting 15A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3904, at 195–96 (1992))). Thus, for the purposes of this appeal, we take as given that the officers violated Washington's Fourth Amendment rights when they entered his room without first obtaining valid consent.

### 4. Whether the Officers Violated Washington's Fourth Amendment Rights When They Began Physically Searching His Room Without His Consent

After the officers unconstitutionally entered Washington's room, Detective Chittenden asked Washington if he had anything unlawful in the room. Washington admitted that he possessed a line of methamphetamine and indicated its general location. While Officer Sceirine and Detective Chittenden continued to question

Washington about whether he was involved in manufacturing and/or distributing methamphetamine, one of the officers in Washington's room moved Washington's coat and discovered a line of methamphetamine.

Washington's admission that he possessed methamphetamine certainly permitted the officers to look in the area Washington indicated to see if the line was in plain view, but it did not provide the officers a legal basis for lifting his coat. *See Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (moving something even a few inches constitutes a search and falls within the plain view exception only if the officer had probable cause to believe the *thing being moved* is evidence of a crime at the time he moved it); *see also United States v. Davis,* 332 F.3d 1163, 1168 n. 3 (9th Cir.2003) ("[E]ven if the bag [containing a prohibited shotgun] had been open, the fact that it was stored under the bed, thus requiring the police to move it, would have required probable cause, since such movement would constitute a search." (citing *Hicks,* 480 U.S. at 324–25, 107 S.Ct. 1149)). Thus, the officers' movement of Washington's coat was an unconstitutional search under the Fourth Amendment.

### 5. Whether the Officers' Repeated Violations of Washington's Fourth Amendment Rights Require Suppression [11]

██ After the officers repeatedly violated Washington's Fourth Amendment rights, Washington signed a permission to search form, which purportedly gave his consent to search his room.

---

**11.** "We review *de novo* the mixed question of fact and law whether evidence deriving from an illegal search is sufficiently tainted to require suppression, because legal concepts must be applied and judgment exercised about the values that animate the Fourth Amendment." *United States v. Johns,* 891 F.2d 243, 244 (9th Cir.1989).

During their search, the officers found the gun that resulted in his arrest and conviction for being a felon in possession of a firearm. The district court found that Washington's signature on the permission to search form was freely given within the meaning of the Fifth Amendment and that it purged any taint that resulted from the officers' prior violations of Washington's Fourth Amendment rights. We need not address whether Washington's signing of the permission to search form was voluntary under the Fifth Amendment.[12] Even if it was voluntary, the district court erred in concluding that the consent purged the taint of the officers' prior violations of Washington's Fourth Amendment rights.

" 'Under the Fourth Amendment ... evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding ... consent, unless subsequent events have purged the taint.' " *United States v. Bautista*, 362 F.3d 584, 592 (9th Cir.2004) (quoting *United States v. Chavez–Valenzuela*, 268 F.3d 719, 727(9th Cir.2001), *amended by*, 279 F.3d 1062 (2002), and holding that "consent was tainted and the evidence obtained pursuant to it should

have been suppressed"); *see also United States v. Hotal*, 143 F.3d 1223, 1228 (9th Cir.1998) ("Consent to search that is given after an illegal entry is tainted and invalid under the Fourth Amendment."). Put another way,

> [u]nder established law, evidence obtained through the "exploitation" of illegal behavior by the police cannot be admitted into evidence.... [O]nce an illegality has been shown, we must decide whether "the evidence has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*United States v. Crawford*, 372 F.3d 1048, 1092(9th Cir.2004) (en banc) (W.Fletcher, J., dissenting) (quoting *Brown*, 422 U.S. at 599). The test for determining whether the primary taint of a prior constitutional violation has been purged is commonly referred to as an "attenuation analysis" or an "attenuation test." *E.g.*, *id.* at 1092–94, 95 S.Ct. 2254(W.Fletcher, J., dissenting) (referring, interchangeably to "attenuation analysis" and "attenuation test"). An attenuation analysis advances the exclusionary rule's "twin aims of deterrence

---

12. We express no opinion on whether Washington's signature on the permission to search form was voluntary. Whether a consent to search is voluntary under the Fifth Amendment is an entirely separate question from whether a consent to search is tainted by a prior Fourth Amendment violation. *See New York v. Harris*, 495 U.S. 14, 23, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) ("Attenuation analysis assumes that the statement is 'voluntary' [under the Fifth Amendment] and asks whether the connection between the illegal police conduct and the statement nevertheless requires suppression to deter Fourth Amendment violations."); *United States v. Patzer*, 277 F.3d 1080, 1085 (9th Cir.2002) ("Because the consent was tainted ... we need not resolve whether it was nonetheless voluntary...."); *Garvin v. Farmon*, 258 F.3d 951, 956 (9th Cir.2001) ("The 'causal chain between the illegal arrest and the statements

made' had to be broken for the statements to be admissible despite the Fourth Amendment violation, regardless of whether the statements satisfied the Fifth Amendment['s voluntariness test].") (quoting *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1974)); *United States v. Furrow*, 229 F.3d 805, 813 (9th Cir.2000) ("For purposes of the Fourth Amendment, a determination that a consent was voluntarily made 'only satisfies a threshold requirement.' The mere fact of voluntariness does not mean that a consent is not tainted by a prior Fourth Amendment violation.") (quoting *United States v. George*, 883 F.2d 1407, 1415 (9th Cir.1989), and citing *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1299 (9th Cir. 1988)), *overruled on other grounds*, *United States v. Johnson*, 256 F.3d 895 (2001) (en banc).

and judicial integrity." *Id.* at 1054, 95 S.Ct. 2254 (citing *Brown,* 422 U.S. at 603, 95 S.Ct. 2254); *see also Brown,* 422 U.S. at 599–600, 95 S.Ct. 2254(noting that "considerations of deterrence and of judicial integrity, by now, have become rather commonplace in the [Supreme] Court's [exclusionary rule] cases" (citations and quotation omitted)). Upon a finding that evidence is tainted by illegal behavior by the police, "*all* evidence obtained ... as a direct causal result of it" must be suppressed. *Grubbs,* 377 F.3d at 1079 (emphasis in original) (citing *Hotal,* 143 F.3d at 1228; *Crawford,* 372 F.3d at 1053–54; *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

██ To determine whether a prior illegality is sufficiently connected to the subsequent consent, we look to three factors: (1) the "temporal proximity between illegality and consent;" (2) "the presence of intervening circumstances;" and (3) "the purpose and flagrancy of the official misconduct." *Chavez–Valenzuela,* 268 F.3d at 727–28 (citations omitted).

### a. Temporal Proximity

██ "The lack of a significant intervening period of time does not, in itself, require that the evidence be suppressed for want of sufficient attenuation," *United States v. Wellins,* 654 F.2d 550, 555 (9th Cir.1981), but it does "bear ... directly on the probability of taint," *Delgadillo–Velasquez,* 856 F.2d at 1300. Here, the temporal proximity between the officers' violations of Washington's Fourth Amendment rights and his written consent weighs heavily in favor of suppressing the fruits of the officers' search. At most, fifteen minutes separated the officers' unconstitutional seizure of Washington and Washington's signing of the permission to search form.[13] Even less time separated Washington's

signing of the permission to search form from the officers' unconstitutional visual search of Washington's room, their unconstitutional entry into Washington's room, and their unconstitutional search for methamphetamine. Such little time between the officers' repeated violations of Washington's Fourth Amendment rights and Washington's signing of the permission to search form was insufficient to purge the taint of the officers' repeated unconstitutional conduct. *See, e.g., Brown,* 422 U.S. at 604, 95 S.Ct. 2254 (less than two hours insufficient to purge taint); *Taylor v. Alabama,* 457 U.S. 687, 691, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (six hours insufficient); *United States v. Perez–Esparza,* 609 F.2d 1284, 1290(9th Cir.1979) (three hours insufficient); *see also George,* 883 F.2d at 1416 ("As best we are aware, no court has weighed the first factor against a defendant when his inculpatory statement followed illegal police conduct by only a few hours.").

### b. Intervening Circumstances

██ Next, in determining whether intervening circumstances may have purged the taint of a prior illegality, we look not at the defendant's conduct, but rather at "intervening event[s] of significance" that "render inapplicable the deterrence and judicial integrity purposes that justify excluding" tainted evidence. *Perez–Esparza,* 609 F.2d at 1289, 1290 n. 3 (quoting *Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)); *see also United States v. Ricardo D.,* 912 F.2d 337, 343(9th Cir.1990). Intervening circumstances that militate in favor of attenuation must be sufficiently important to ensure that potentially tainted evidence was "come at by way of" some process other than the exploitation of an illegal search.

---

**13.** As noted earlier, the permission to search form was signed at 8:45 p.m., approximately fifteen minutes after the officers returned to the Comstock.

*Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. 407; *see also Crawford,* 372 F.3d at 1054 ("Evidence obtained by . . . illegal action of the police is 'fruit of the poisonous tree,' warranting application of the exclusionary rule if, . . . 'the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (quoting *Brown,* 422 U.S. at 599, 95 S.Ct. 2254)). Examples include release from custody, an appearance before a magistrate, or consultation with an attorney, "such that we would be able to say that [a defendant's] consent to search was an 'unconstrained, independent, decision' that was completely unrelated to [the] initial unlawful" violation. *George,* 883 F.2d at 1416.

The Government argues that when Washington signed the permission to search form, which advised him of his right to refuse to consent, that act was an intervening event sufficient to purge the taint of the officers' prior illegal conduct.[14]

We disagree. Washington's act of signing the permission to search form, which advised him of his right to refuse to consent, is distinct from examples of "intervening circumstances" that have been considered sufficient to purge the taint of prior constitutional violations. *See id.* Unlike releasing an individual from custody, bringing an individual before a magistrate, or allowing an individual to consult with an attorney, signing a permission to search form, which advises of the right to refuse to consent, does not have a tenden-

cy to distance the suspect from the coercive effects of temporally proximate constitutional violations. Rather, the suspect's desire to avoid suffering additional constitutional violations and/or a continuing unconstitutional detention, as in this case, is what may prompt the suspect to avoid further confrontation by giving consent.

Additionally, we perceive significant problems with the Government's argument that Washington's signing the permission to search form purged the taint of the officers' unconstitutional conduct. Consent is often sought, as it was in this case, to sanction the officers' prior illegal conduct.[15] A suspect's knowledge of a prior illegal search can give rise to a sense that refusing to consent would be futile. *See Furrow,* 229 F.3d at 814("[A] person might reasonably think that refusing to consent to a search of his home when he knows that the police have, in fact, already conducted a search of his home, would be a bit like closing the barn door after the horse is out."). Moreover, if we were to adopt the Government's position, all an officer would have to do to purge the taint of earlier illegal conduct would be to notify (or, in some cases, remind) the suspect before they consent that they are free to refuse to do so. This would effectively eviscerate the exclusionary rule's goal of deterring police misconduct because it would give officers who recently violated a suspect's constitutional rights a chance to grant themselves a free pass by uttering a few magic words and encourage—rather than discourage—investigatory shortcuts.

---

14. We note that, as a factual matter, it is unclear whether Washington actually read the form before signing it. The district court recognized only that Washington "was given a *chance* to read it." It is clear from the transcript and tape of the officers' encounter with Washington, however, that the form was never read to Washington and that he was never otherwise told that he could refuse to consent.

15. In the present case, the officers conducted three different unlawful searches of Washington's room within the meaning of the Fourth Amendment—by illegally gaining visual access to it, by illegally entering it, and by illegally beginning to search it—before they obtained Washington's signature on the permission to search form.

*See Brown*, 422 U.S. at 602–03, 95 S.Ct. 2254 ("Any incentive to avoid Fourth Amendment violations would be eviscerated by making the [*Miranda* ] warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' "). *Cf. Missouri v. Seibert*, —— U.S. ——, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion) (suppressing confession where officers intentionally delayed giving *Miranda* warnings until after confession was obtained).

Significantly, in the *Miranda*-warning context, the Supreme Court rejected in *Brown* an argument analogous to the Government's argument here—*viz.*, that *Miranda* warnings by themselves may purge the taint of a temporally proximate prior illegal arrest at which a confession was obtained. *See Brown*, 422 U.S. at 603, 95 S.Ct. 2254 ("*Miranda* warnings, alone and per se, cannot always make the act sufficiently a product of free will [and] break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited."). Following *Brown*, the Seventh Circuit recently rejected *precisely* the Government's argument here. *See United States v. Ro-*

beles–Ortega*, 348 F.3d 679, 684 (7th Cir. 2003) (holding that written consent was tainted by illegal entry of five federal agents where request for consent was made "[i]mmediately after [a protective] sweep"). We agree with the Seventh Circuit that "[t]he government's attempt to turn all written consents into an 'intervening circumstance' breaking the causal chain is inconsistent with ... the Supreme Court's rejection of a similar argument with respect to *Miranda* warnings in *Brown*." [16] *Id.*

### c. Purpose or Flagrancy of the Official Misconduct

Finally, courts favor suppression if law enforcement officials conducted the illegal search with the purpose of extracting evidence against the defendant or if they flagrantly broke the law in conducting the search.[17] *See Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254.

On one hand, courts frequently hesitate to find that an officer's violation of the law was "purposeful" or "flagrant" when the officer broke the law acting in good faith. *See, e.g., United States v. Boone*, 62 F.3d 323, 325 (10th Cir.1995) (noting that "a mistaken belief" that the defendant "had consented to the search ... rises to the level of a Fourth Amendment violation,

---

**16.** The Government's position would also conflate the Fifth Amendment voluntariness analysis with *Brown's* distinct Fourth Amendment attenuation analysis. *See supra* note 12. It "is ... wrong to conclude that ... consent ... should be double counted as consent under the Fifth Amendment and as an intervening circumstance under the Fourth." *United States v. Seidman*, 156 F.3d 542, 555–56 (4th Cir.1998) (Michael, J., concurring).

**17.** In reciting the third attenuation factor, courts usually choose a conjunctive phrasing ("purpose and flagrancy"), but then find in favor of taint if there is evidence of *either* purposeful extraction of evidence or flagrant illegality. *See, e.g., Dunaway*, 442 U.S. at

218–19, 99 S.Ct. 2248 (only "purpose"); *United States v. Jenkins*, 938 F.2d 934, 941 (9th Cir.1991) (only "flagrancy"); *George*, 883 F.2d at 1416 (only "flagrancy").

We previously noted that, in *Brown*, the Supreme Court indicated that this third prong of the attenuation test was "particularly" important. *George*, 883 F.2d at 1416 (discussing *Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254). However, we also previously noted that "the Court in *Dunaway* gave short shrift to the 'purpose and flagrancy' factor emphasized in *Brown*." *Perez–Esparza*, 609 F.2d at 1291. We need not attempt to resolve this tension in the Supreme Court's attenuation jurisprudence because we find that all three attenuation factors weigh in favor of suppression.

[but] it does not qualify as flagrant misconduct" that would favor suppression); *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir.1994) (holding that attenuation existed where, among other considerations, the "officer's conduct was in good faith"); *United States v. Richard*, 994 F.2d 244, 252 (5th Cir.1993) (holding that attenuation existed where, among other considerations, "both agents reasonably believed that they had consent to search" the defendant's motel room). Here, the district court appears to have concluded that the officers acted in good faith. It commented that

> [t]he transcript ... indicates th[e officers] were trying to investigate crime, doing it in a professional way. Their demeanor, tone and dress all indicated a professional approach to this, and not an oppressive action that would overbear the defendant's ability to resist and cause him to consent when he didn't intend to do so.

On the other hand, we do not think that substantial evidence supports such a conclusion. Officer Sceirine admitted that he and the other officers approached Washington's room without probable cause to search it. Yet, he and the other RPD officers repeatedly attempted to—and eventually did—gain access—first visually, and later, physically—to Washington's room in violation of Washington's Fourth Amendment rights. It is particularly significant that Sceirine thrice indicated to Washington that the officers could arrest him for failing to register with the RPD as a gun-crime convict. As Sceirine testified at the district court's suppression hearing, he was "conveying to Washington ... that [he] could arrest him." But Sceirine never arrested Washington for failing to register with the RPD.[18] Thus, Sceirine's repeated reminders to Washington that the officers could arrest him at any time, in our view, appear to have been given as a tactic to coerce Washington into consenting to the search of his room. Through this approach, Sceirine was hoping to get around the warrant requirement for residential searches because, by his own admission and as the parties agree, the officers did not have probable cause to obtain a search warrant. We also find significant that, once the officers were unconstitutionally inside Washington's room, Sceirine used the fruits of the officers' unconstitutional entry and unconstitutional recovery of Washington's methamphetamine line to coax Washington into signing the permission to search form.

On this record, we find it difficult to conclude that the officers acted in good faith towards Washington. Indeed, contrary to the district court's findings, the officers—once they had completed their pat-down search of Washington and finished questioning him in the hallway outside his room about his involvement in methamphetamine manufacturing and/or distribution—unconstitutionally capitalized on their prior violations of Washington's Fourth Amendment rights.

Further, the record is clear that the purpose of the officers' encounter with Washington was to obtain evidence of criminal activity—in particular, evidence of a methamphetamine lab—in Washington's room. As noted above, the audio tape and transcript of Washington's encounter with the RPD officers is replete with statements by Officer Sceirine that he and the other officers wanted to search Washington's room for such evidence. Yet, at the time that the officers unconstitutionally en-

---

**18.** In fact, when Sceirine placed the permission to search form in front of Washington and asked him to sign it, Sceirine told Washington to ignore the top half of the form which contained a *Miranda* waiver because, according to the transcript, "this [*Miranda* warning] doesn't apply because you're not under arrest, ok."

tered Washington's room, nothing that Washington had said or done and nothing that the officers observed transformed their *lack* of probable cause to search Washington's room into probable cause. Against this backdrop, the impropriety of the officers' unconstitutional entry of Washington's room—much less, their continued presence and extended encounter with Washington—becomes "obvious.... The [entry], both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." *Brown,* 422 U.S. at 605, 95 S.Ct. 2254.

Because the purpose of the officers' encounter with Washington—in particular, the officers' repeated efforts to conduct a warrantless search of Washington's room—was to "detect evidence of ordinary criminal wrongdoing," *City of Indianapolis v. Edmond,* 531 U.S. 32, 41, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), and because there is strong evidence that the officers did not act in good faith toward Washington, we conclude that the "purpose and flagrancy" factor weighs in favor of suppression. Indeed, only suppression will serve the "deterrence principle inherent in the exclusionary rule." *United States v. Ienco,* 182 F.3d 517, 526 (7th Cir.1999).

## IV. CONCLUSION

For the foregoing reasons, we conclude that the six RPD officers violated Washington's Fourth Amendment rights on four separate occasions throughout their encounter with him. We also conclude that Washington's written consent to search his room, the officers' discovery of Washington's gun, and Washington's confession to owning the gun were tainted by those four constitutional violations. Accordingly, the district court should have granted Washington's motion to suppress.

The order denying Washington's motion to suppress is, therefore, REVERSED, the judgment is VACATED, and the case is REMANDED to the district court for further proceedings.

BEAM, Circuit Judge, concurring:

I concur in the result reached by the court.