**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

NICHOLAS J. MCWEENEY,
    *Defendant-Appellant.*

No. 05-10349

D.C. No.
CR-03-00195-PMP

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
April 6, 2006—San Francisco, California

Filed July 21, 2006

Before: Alfred T. Goodwin, Betty B. Fletcher, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Goodwin;
Dissent by Judge B. Fletcher

**COUNSEL**

Jason Carr, Assistant Federal Public Defender, Las Vegas, Nevada, for the defendant-appellant.

Brian Quarles, Assistant United States Attorney, Las Vegas, Nevada, for the plaintiff-appellee.

**OPINION**

GOODWIN, Circuit Judge:

Nicholas J. McWeeney appeals his conviction for violating 18 U.S.C. §§ 922(g)(1), 924(a)(2) (being a felon in possession

of a firearm). He assigns error to the denial of his motion to suppress. Because the district court did not make a finding with respect to coercion, we vacate the judgment of conviction and remand the case to the district court with instructions to conduct an evidentiary hearing consistent with this opinion.

## I.   Factual and Procedural Background

On December 2, 2002, Officer Andrew Walsh of the Las Vegas Metropolitan Police department noticed a white Pontiac Sunfire with no front license plate. Officer Walsh observed the rear license plate and checked it against the state computer, which indicated that the Sunfire had previously been stolen and returned to the owner. His suspicion aroused, Officer Walsh stopped the car, obtained identification from the occupants and determined that the driver was Jesus Lopez and the passenger was McWeeney.

The car was registered to McWeeney's mother. McWeeney told Officer Walsh that he was using the car with his mother's permission and that he allowed Lopez to drive because he was tired. Officer Walsh then asked McWeeney and Lopez if they were in possession of anything that "they were not supposed to have." McWeeney and Lopez responded in the negative. Officer Walsh also asked if they "mind[ed] if [he] looked" in the car. McWeeney and Lopez orally consented to Officer Walsh's request. The government does not dispute that this consent provided the sole authority for the government to search McWeeney's car.

Officer Walsh then returned to his patrol car and ran background checks on McWeeney and Lopez. The background checks revealed that McWeeney was a convicted felon and that Lopez had a previous weapons-related arrest. Officer Walsh called for backup and waited for it to arrive before proceeding. Seven minutes later, Officers Martin and Howard arrived on the scene.

Officer Walsh relayed all relevant information to Officers Martin and Howard, including that McWeeney and Lopez had consented to the search of the car. Officer Walsh then approached the Sunfire and reminded McWeeney that he was going to look in the car, stating "if you have nothing that you aren't supposed to have, I'm going to take a look." McWeeney and Lopez were asked to exit the Sunfire and stand facing the front of Officer Walsh's patrol car.

Officer Howard, relying on Officer Walsh's statement regarding McWeeney and Lopez's consent, searched the Sunfire. After finding nothing in the passenger compartment, Officer Howard opened the trunk. Officer Howard noticed that the trunk's carpet lining was loose, pulled the carpet back, and found the handgun that is the subject of this case.

Neither McWeeney nor Lopez was allowed to observe the search. At one point during the search, Officer Howard noticed that either McWeeney or Lopez "was looking back" at him as he searched the Sunfire, and either he or Officer Martin instructed that person "to face forward and stop looking back." Officer Howard could not remember which of the two men he told to turn around. After the handgun was found, the officers handcuffed McWeeney and Lopez and placed them in separate patrol cars. Officer Walsh then called for the firearms unit. Approximately two hours after the stop, McWeeney was charged with being a felon in possession of a firearm.

Initially, McWeeney filed a motion to suppress the firearm as the fruit of an illegal search.[1] United States Magistrate Judge Lawrence Leavitt held an evidentiary hearing to assess McWeeney's motion and recommended that McWeeney's

---

[1]McWeeney's suppression motion also sought to suppress statements obtained from him without a *Miranda* warning. However, because that issue was not preserved, we discuss the suppression motion only as it relates to the firearm.

suppression motion be denied. United States District Judge David W. Hagen adopted this recommendation and denied the motion. McWeeney then pled guilty to one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), but reserved the right to appeal the denial of his motion to suppress.

McWeeney, free on a personal recognizance bond until his sentencing scheduled for September 13, 2004, absconded and did not appear for sentencing. He did not appear again until his pretrial release violation hearing on April 11, 2005. McWeeney's sentencing was rescheduled for May 4, 2005. In the interval between McWeeney's suppression motion and his sentencing, Judge Hagen retired and McWeeney's case was reassigned to Chief United States District Judge Philip M. Pro. On May 11, 2005, Chief Judge Pro sentenced McWeeney to fifty-one months imprisonment and three years of supervised release. Shortly thereafter, McWeeney filed this appeal, arguing that his Fourth Amendment rights were violated by the search.

## II.   Standard of Review

We review de novo the district court's denial of McWeeney's motion to suppress. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). Factual findings underlying the denial of the motion are reviewed for clear error. *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004).

## III.   Analysis

[1] Reasonableness is the foundation of Fourth Amendment jurisprudence. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177

(1990)). Consensual searches are allowed because it is reasonable for law enforcement agents to conduct a search after receiving consent. *Id.* at 250-51. A suspect is free, however, after initially giving consent, to delimit or withdraw his or her consent at anytime. *See id.* at 252 ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); *United States v. Ward*, 576 F.2d 243, 244 (9th Cir. 1978) ("[S]ince [appellee's] action was unilateral and contained no agreement as to duration it was implicitly limited by [appellee's] right to withdraw his consent." (quoting *Mason v. Pulliam*, 557 F.2d 426, 429 (5th Cir. 1977))).

**[2]** It is a violation of a suspect's Fourth Amendment rights for a consensual search to exceed the scope of the consent given. *See Jimeno*, 500 U.S. at 252. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251 (citing *Rodriguez*, 497 U.S. at 183-89).

In this case, McWeeney first argues that the reasonable person would *not* have understood Officer Walsh's request to "look" in the car to include searching the trunk and lifting the loose carpet liner. According to McWeeney, the verb "look" only connotes a cursory scan of the car and does not include a search. Following this line of reasoning, McWeeney claims that by searching the trunk and lifting the loose carpet lining, Officer Howard exceeded the scope of McWeeney's lesser consent, which only allowed the officers to quickly glance in the car. McWeeney also argues that his Fourth Amendment rights were violated because he and Lopez were deliberately prevented from observing the search and, thus, could not meaningfully exercise their constitutional right to withdraw consent if any of the officers' actions exceeded the scope of consent given.

**[3]** The first of McWeeney's arguments is easily disposed of and we write simply to clarify the rule in this Circuit, that

a request from a law enforcement agent to "look," in the proper context, is the same as a request to "search." We have previously held that an officer does not exceed the scope of a suspect's consent by "searching" when the officer asked only if he or she could "look." *See United States v. Sparks*, 87 F.3d 276, 277 (9th Cir. 1996) ("[The officer] asked him if it would be okay to *look* in the trunk because that's where the citizen said Sparks had put the shotgun. According to [the officer], Sparks said that would be fine . . . ." (emphasis added)); *see also United States v. Sierra-Hernandez*, 581 F.2d 760, 764 (9th Cir. 1978) (holding a search reasonable when "one of the agents asked the appellant, 'May I *look* inside the truck?' The answer [being] affirmative . . . the agent looked not only in the cab of the truck but also in the back cargo portion, and finally under the hood" (emphasis added)).

**[4]** Officer Howard did not exceed the scope of McWeeney's *general* consent by searching the trunk. *See United States v. Gutierrez-Mederos*, 965 F.2d 800, 803-04 (9th Cir. 1992). In *Gutierrez-Mederos*, the officer asked Gutierrez-Mederos if he could "check" for weapons and narcotics. *Id.* at 803. Gutierrez-Mederos replied, "go ahead," placing no restrictions on the search. *Id.* at 803-04. "This general statement authorized the trooper to search any container within the car that reasonably could contain contraband." *Id.* at 804. Similarly, we have previously held that such general consent can include consent to search a car's trunk. *See United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994) ("Although a suspect's consent to search a car may not automatically include consent to search the trunk, in the present case, the district court did not clearly err in finding that Cannon's consent included the trunk.").

**[5]** Here, Officer Walsh asked if he could "look" for anything that McWeeney and Lopez were "not supposed to have." "The scope of a search is generally defined by its expressed object," *Jimeno*, 500 U.S. at 251, and one can reasonably assume, as the magistrate judge found a reasonable

person would, that Officer Walsh's request here concerned a search for weapons and narcotics. Therefore, realizing that Officer Howard was looking for weapons and narcotics, the reasonable person would expect him to search the trunk and look under loose carpet. *See id.* ("Contraband goods rarely are strewn across the trunk or floor of a car." (quoting *United States v. Ross*, 456 U.S. 798, 820 (1982))); *see also Gutierrez-Mederos*, 965 F.2d at 804 (holding the manner of a search is reasonable when "[t]he record indicate[d] that [the officer] did not pry open or break into the side panel . . . [n]or . . . force the loose cardboard divider apart, but rather pulled it back").

**[6]** No doubt McWeeney and Lopez gave *general* consent to search the car. However, they had a constitutional right to modify or withdraw their general consent at anytime, including the point at which the officers prevented them from observing the search. It is possible, however, that the officers in this case improperly coerced McWeeney and Lopez into believing that they had no right to withdraw or limit their consent.

In the seminal case applying the exclusionary rule to evidence seized by a state in violation of the Fourth Amendment, the Supreme Court wrote

> If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land.

*Mapp v. Ohio*, 367 U.S. 643, 648 (1961) (quoting *Weeks v. United States*, 232 U.S. 383, 393 (1914)). Just as the Fourth Amendment would be valueless without the use of the exclusionary rule, so too would the right to withdraw consent be valueless if law enforcement officers are permitted deliberately to coerce a citizen into believing that he or she had no authority to enforce that right.

**[7]** By turning around to view the search, McWeeney and Lopez implicitly made clear their desire to determine whether the search comported with the consent they had given. Perhaps it is true, as the government argues, that when the officers prevented them from turning around, McWeeney and Lopez should have realized that the search exceeded the scope of their consent and immediately withdrawn it. The government would like us to hold that, by failing to withdraw consent when they were asked to turn around, McWeeney and Lopez implicitly consented to the search. This we will not do.

**[8]** As the government readily admitted at oral argument, prior to finding the handgun, the officers had no probable cause to handcuff McWeeney and Lopez and no probable cause to require that they sit in the back of a patrol car. Rather, the officers were relying on McWeeney and Lopez's consent, as free citizens, to aid in the officers' law enforcement duties. Consensual searches are vital to law enforcement efforts because they "may be the only means of obtaining important and reliable evidence" and "may result in considerably less inconvenience for the subject of the search." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227-28 (1973).

**[9]** At no time during their encounter with the officers were McWeeney and Lopez under a duty to submit to a search. Rather, at all times the conditions of the search, or whether there was to be any search at all, remained exclusively in McWeeney and Lopez's control. "[T]he Fourth Amendment[ ] stands as a protection of . . . values reflecting the concern of our society for the right of each individual to be let

alone. To recognize this is no more than to accord those values undiluted respect." *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416 (1966).

**[10]** However, when McWeeney or Lopez turned around to watch the search, they may have been asserting their right to delimit or withdraw their consent and coercively not been permitted to do so when instructed by the officers to turn back around. It is unclear whether the general atmosphere, or the officers' decision to prevent the observation of the search, was coercive. The district court made no finding with respect to coercion and there is nothing in the record which conclusively establishes that the officers' actions created a coercive atmosphere. Coercion, however, is the linchpin in this case. Absent coercion, McWeeney and Lopez simply failed to exercise their right to withdraw consent and the search was entirely proper. On the other hand, if the officers did coerce McWeeney and Lopez into believing that they had no authority to withdraw their consent, the officers violated McWeeney and Lopez's Fourth Amendment rights and the search was illegal.

**[11]** Whether or not McWeeney and Lopez were coerced into believing that they had no authority to withdraw their consent is a question of fact and must be decided by the district court in the first instance.[2] The inquiry is essentially identical to the one required of the district court in assessing a

---

[2]The dissent misconstrues why there is a need for additional facts with respect to coercion. We do not hold that there is a constitutional right to observe a search, but rather that there is a constitutional right to withdraw consent once it is given. Thus, the question is not whether McWeeney or Lopez was prevented from observing the search or "determining what was going on," as the dissent believes, but instead whether the atmosphere in toto was coercive to such an extent that they were prevented from withdrawing their consent. As there is no constitutional right to observe a search, we are not convinced, without more evidence, that the officers' conduct amounted to a constitutional violation. The district court is in the best position to gather this additional evidence and to make the initial determination of whether the atmosphere was unconstitutionally coercive with respect to withdrawing consent.

Fourth Amendment seizure question. We thus adopt the reasoning used in Fourth Amendment seizure cases and hold that the district court must determine whether the officers created a setting in which the reasonable person would believe that he or she had no authority to limit or withdraw their consent. *Cf. United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (holding that a seizure occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business" (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)) (internal quotation marks omitted)); *see also Bostick*, 501 U.S. at 436 (holding that where the "free to leave" analysis is inapplicable to decide whether a seizure occurred, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter").[3]

Under this analysis, the district court must determine whether the officers' conduct is objectively recognizable as intimidation directed mostly (or exclusively) at coercing McWeeney and Lopez into believing that they had no right to withdraw or delimit their consent once it was given, and whether a reasonable person faced with the officers' conduct would have believed that no such right existed. The non-exhaustive list of objective factors the district court should consider includes: (1) the language used to instruct the suspect; (2) the physical surroundings of the search; (3) the extent to which there were legitimate reasons for the officers to preclude the suspect from observing the search; (4) the relationship between the means used to prevent observation of the search and the reasons justifying the prevention; (5) the

---

[3]We use a similar approach under the Fifth Amendment to determine whether an individual was in custody and therefore entitled to a *Miranda* warning. *See United States v. Kim*, 292 F.3d 969, 973-74 (9th Cir. 2002) (holding that an individual is in custody when "the officers establish[ ] a setting from which a reasonable person would believe that he or she was not free to leave").

existence of any changes in circumstances between when consent is obtained and when the officers prevent the suspect from observing the search; and (6) the degree of pressure applied to prevent the suspect either from observing the search or voicing his objection to its proceeding further.[4] Cf. *Orhorhaghe v. INS*, 38 F.3d 488, 494-96 (9th Cir. 1994) (identifying five objective factors that aid in determining whether a reasonable person would have felt "at liberty to ignore the police presence and go about his business"); *Kim*, 292 F.3d at 974 (listing several objective factors that are "likely to be relevant to deciding" whether an interrogation turned custodial). Once the coercion question has been answered, the district court should determine whether the search in this case violated McWeeney's Fourth Amendment rights, and if so, whether the violation justifies suppression of the evidence.

## IV.   Conclusion

[12] Although the district court did not err in finding that a request to "look" in the car, in context, was the same as a request to "search" the car, it is not clear whether the officers coerced McWeeney and Lopez into believing that they had no right to withdraw their consent. The district court must answer this question. We therefore VACATE the judgment of conviction and REMAND the case to the district court for an evidentiary hearing, consistent with this opinion, in order to determine whether McWeeney and Lopez were coerced into believing that they had no authority to withdraw their consent. If the district court finds they were coerced, then McWeeney's conviction cannot stand.

**VACATED AND REMANDED.**

---

[4]The sixth consideration is best expressed in *Washington* as looking to see "whether the officer's officious or authoritative manner would imply that compliance would be compelled." 387 F.3d at 1068.

B. FLETCHER, Circuit Judge, dissenting in part:

I concur in the majority opinion in all respects except I dissent from the need for remand to determine whether coercion prevented McWeeney from exercising his right to withdraw his consent. McWeeney and Lopez were told by uniformed officers to face away from the car so that they could not see the search. When one of them peeked over his shoulder he was told in no uncertain terms to turn back. What more "coercion" was needed to prevent them from determining what was going on? To require the district court to consider a laundry list of factors is nonsensical. Any reasonable person would recognize that two punk kids ordered out of their car, by police officers, told to turn their backs while their car is searched are afraid to disobey authority. Accordingly I dissent from the remand.