**UNITED STATES of America**

v.

**Jose Homero GUERRERO.**

**Criminal Action No. B–11–186–1.**

United States District Court,
S.D. Texas,
Brownsville Division.

Aug. 15, 2011.

Carrie Wirsing, United States Attorney's Office, Brownsville, TX, for Plaintiff.

Reynaldo S. Cantu, Jr., Federal Public Defender, Brownsville, TX, for Defendant.

## ORDER

ANDREW S. HANEN, District Judge.

On February 13, 2011, at approximately 3:30 p.m., Department of Public Safety ("DPS") Trooper Orlando Olivarez initiated a traffic stop on a Ford Expedition. Trooper Olivarez had been traveling southbound on Highway 77, a divided four-lane thoroughfare stretching from the Mexican border to north Texas. The Expedition was driven by (and was solely occupied by) Jose Homero Guerrero ("Defendant" or

"Guerrero"). As the trooper drove, he could not see the Mexican registration which is normally displayed on the back window of the vehicle somewhere above the back license plate. Trooper Olivarez pulled in behind the Ford and confirmed his initial impression that the Expedition, while sporting Mexican license plates, did not have the requisite registration sticker normally affixed on the back window.

Since he was unable to see the appropriate registration sticker, the trooper made the above-referenced traffic stop. As he approached the vehicle, he had in mind merely issuing a warning. He asked the Defendant for the applicable paperwork (driver's license and vehicle registration) and informed him of the reason for the stop. The Defendant pointed out that the sticker was on the front windshield, even though the sticker was hidden, at least in part, by the tinting of the windshield. As Guerrero handed over the requested documents—Texas driver's license to go along with the Mexican registration paperwork—Trooper Olivarez noticed that Guerrero's hands were shaking, which struck Trooper Olivarez as inappropriately nervous behavior since he had already informed him that he was merely going to issue a warning.

Trooper Olivarez returned to his cruiser to run the license and registration and to prepare the warning paperwork. Guerrero, at the trooper's request, also exited his vehicle. As they waited for the radio response to Trooper Olivarez' inquiries, the trooper asked Guerrero where he was going; and Guerrero told him he was going to help his uncle who was having car trouble in Riviera. (His uncle had been towing cars back to Mexico from Louisiana.) Guerrero explained that the Expedition belonged to his aunt, who lives in Mexico. He picked up her car at the downtown Payless in Brownsville where she had driven it. She was then going to walk back to Mexico. She apparently did not have permission from immigration to travel to Riviera to pick up her husband. Much of this conversation occurred while Guerrero was standing adjacent to Trooper Olivarez' cruiser and Trooper Olivarez was seated in the car waiting for the return information from the driver's license and registration inquiry. Various points in Guerrero's story seemed suspicious to the trooper; and, when added to Guerrero's physical signs of nervousness, they raised the trooper's interest in Guerrero and the vehicle. All of this conversation was in Spanish, which as will be seen below is a critical element in this Motion to Suppress.

At this point in time, the following exchange occurred:

| Spanish | English |
|---|---|
| T. Okay. Y su tia, donde la dejó? | T. Okay. And your aunt, where did you leave her? |
| D. Ahorita ella se quedó en Brownsville. | D. Right now she stayed in Brownsville. |
| T. Pero dónde? | T. But where? |
| D. Alli donde está el Payless... alli en el... you know Brownsville? | D. There, where Payless is... there, you know Brownsville? |
| T. Uju. | T. Uh, huh. |
| D. En la Elizabeth. Alli ella a ese iba pues, pos nunca pudo sacar el de ese. Y ellos lo que no quieren es que se le haga muy noche para ahorita, o sea, podemos traer el carro. | D. On Elizabeth. There, she was going to that one, because she never got that one. And they don't want it to get too dark for now, or rather, be able to bring the car. |
| T. Ujum. Y ella con quién se quedó? | T. Uh, huh. And who did she stayed with? |
| D. Ella vive en Matamoros allá. | D. She lives in Matamoros there. |
| T. Pero con quién se quedó alli? | T. But who did she stayed with there? |
| D. Oh! Sola, se fue. | D. Oh! By herself, she left. |
| T. Nomás asi caminando y la dejaste sin vehículo? | T. Just like that walking, and you left her without a vehicle? |
| D. Si. | D. Yes. |
| T. Uuuuuchi! Okay. Señor Guerrero, Guerrero, disculpa, no tiene nada ilegal adentro del vehículo? | T. Uuuuuchi! Okay. Mr. Guerrero, Guerrero, excuse me, you don't have anything illegal inside the vehicle. |
| D. Mande? | D. Excuse me? |
| T. No trae nada ilegal adentro del vehiculo? | T. Do you have anything illegal inside the vehicle? |
| D. No, no, Sir. | D. No, no, Sir. |

| T. | Mariguana? | T. | Marihuana? |
|---|---|---|---|
| D. | No, Sir. | D. | No, Sir. |
| T. | Cocaina? Metanfetaminas? Pildaros? Pildoras ilegales? Armas ilegales? Ahhh... Dinero en más de diez mil dólares que no has declarado? | T. | Cocaine? Methamphetamines? Pills? Illegal pills? Illegal weapons? Huh... money in more than ten thousand dollars which you have not declared? |
| D. | No, Sir. | D. | No, Sir. |
| T. | No?... Me dá permiso para revisar el vehículo? | T. | No? Do you give me permission to search the vehicle? |
| D. | Si, si. | D. | Yes, yes. |
| T. | No le ha hecho nada de compostura o nada asi? | T. | Have you done any repairs or anything like that? |
| D. | No, nada. | D. | No, nothing. |
| T. | Por cuánto tiempo ha tenido el vehículo usted? | T. | How long have you had the vehicle? |
| D. | Ahorita... pues hemos, hemos venido el viaje varias veces.. | D. | Right now... well, we have, we have made the trip several times. |
| T. | Ujum. | T. | Uh, huh. |
| D. | ...como dos veces pero... ahorita, pues nomás, ahorita la he traido yo tambien. | D. | ..like about two times...right now, well, right now I've driven it too. |
| T. | Okay. Pero usted vive con su tia, o no? | T. | Okay. But do you live with your aunt or not? |
| D. | No, vivimos alli pero ella vive... yo, yo vivo aqui en Brownsville tambien. | D. | No, we live there but she lives.. I live here in Brownsville also. |
| T. | Okay. | T. | Okay. |
| D. | Porque, verdad, pos aqui naci. | D. | Because, really, I was born here. |
| T. | Okay. | T. | Okay. |

| D. | Pero mi tia, como ellos van y traen carros y yo a veces voy y les ayudo. | D. | But my aunt, since they go and bring cars, and sometimes I go and help them. |
|----|----|----|----|
| T. | Okay. | T. | Okay. |
| D. | Por eso me... a veces me traigo manejando carros, estirando. | D. | That's why.. Sometimes I bring cars driving them, hauling |
| T. | Okay. | T. | Okay. |
| D. | Pero nomás.. | D. | But just... |
| T. | Okay. | T. | Okay. |
| D. | Se un poco tambien, mas o menos, manejar. | D. | I also know, more or less, to drive. |

After this conversation, the trooper began to look through the car. He noticed fresh tool markings near "the air conditioner condensers, the housing units." To confirm his suspicions, he opened up the hood and looked at the engine where he noticed "new air condition holders." At some point, he radioed for help. The search continued, and eventually he and the other officer discovered bundles of a substance that tested positive for methamphetamine. Guerrero was placed in custody, and he was eventually charged with conspiracy and with knowingly and intentionally possessing with intent to deliver approximately 8.5 kilograms of methamphetamine.

Defendant filed a Motion to Suppress the drugs found by Trooper Olivarez, alleging that he did not knowingly consent to the search of his vehicle. He claims that by assenting to the trooper's request to "revisar" the vehicle, he was giving Trooper Olivarez permission "to inspect," but not to search, the car. He has not questioned the propriety of the initial stop nor any other conduct of the law enforcement agents involved.[1] While the title and

1. In the Defendant's most recent brief in support of the Motion to Suppress, there is a vague suggestion that Guerrero did not voluntarily consent to the search because (1) he was a Mexican national with only nine years of education; (2) he was never informed of his right to refuse consent; and (3) he was in custody when he gave his consent because the trooper retained his documentation. (For purposes of this motion, this Court will assume that this representation as to citizenship is true, although the evidence regarding his citizenship is somewhat questionable. Guerrero told Trooper Olivarez that he lived in Brownsville and was born "here." He also produced a Texas driver license and gave the trooper a Social Security number. This Court's Pretrial Service Report states, however, that Guerrero is a citizen of Mexico with no legal status in the United States.) "[W]hether a consent to a search was in fact 'voluntary' ... is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226–27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A person's custodial status, his level of education, and his awareness of his right to refuse consent, however, are merely factors to be considered in determining voluntariness. *United States v. Jenkins,* 46 F.3d 447, 452 (5th Cir.1995). Further, "the failure to advise an individual of the right to withhold consent is not determinative in and of itself" of a person's voluntary consent. *United States v. Solis,* 299 F.3d 420, 437 (5th Cir.2002). Having considered the Defen-

opening paragraph of the suppression motion references "statements" to be suppressed, no evidence was presented nor arguments made regarding any statements, so this Court's ruling does not address any alleged statements.

For the reasons set out below, the Court denies the Motion to Suppress [Doc. No. 24].

## A. The Defendant Consented To The Search Of The Expedition.

■ The Fourth Amendment protects persons "against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment, however, "does not proscribe all state-initiated search and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250–251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) [2] (citing *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). Searches that have been consented to, therefore, are permissible because "it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Reasonableness also governs the scope of a consensual search: "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. at 183–189, 110 S.Ct. 2793).

■ In this case, the Defendant argues that the methamphetamine discovered in his vehicle should be suppressed because Trooper Olivarez exceeded the scope of his consent to search. As mentioned above, his key argument is that "revisar," the Spanish word that Trooper Olivarez used to ask for consent to search his car, does not mean "to search" in the legal sense of the word. The dictionary used by the Defendant's attorney instead defined "revisar," among other meanings, as "to inspect," which the Defendant argues is equivalent to a state vehicle safety inspection. Although Guerrero never actually testified to his own understanding of what he consented to, his counsel's argument at the hearing was that he had, at most, consented to an "inspection" of the vehicle, and that Trooper Olivarez's "search" therefore exceeded the scope of his consent.

One of the most instructive cases on point comes from the Ninth Circuit, where the argument stemmed not from a dispute over Spanish, but over the meanings of English words. In *United States v. McWeeney*, the defendant argued, similar to Guerrero in this case, that when he agreed to allow the officer in question to "look in" his car, he did not give permission for the officer to search his car. 454 F.3d 1030, 1034 (9th Cir.2006). The defendant argued that a reasonable person would not have understood the officer's request to "look in" the car to include searching the trunk and lifting the loose carpet liner because "look" "connote[d] a

dant's argument, the Court nonetheless finds, from the totality of all the circumstances, that the Defendant voluntarily consented to the trooper's request.

**2.** In *Florida v. Jimeno*, the Supreme Court approved a search of a closed paper bag on a car's floor after the officer received permission to search the car. 500 U.S. at 251, 111

S.Ct. 1801. The Court also quoted *United States v. Ross*, 456 U.S. 798, 820, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), which noted that "[c]ontraband goods rarely are strewn across the trunk or floor of a car." An authorization to search therefore extends well beyond the surfaces of a car.

cursory scan of the car and d[id] not include a search." *Id.* Therefore, he claimed that by searching the trunk and lifting the loose carpet lining, the officer exceeded the scope of the consent that the defendant had given him. *Id.* The Ninth Circuit, however, held "that a request from a law enforcement agent to 'look,' in the proper context, is the same as a request to 'search.'" It noted that the officer had "asked if he could 'look' for anything that [the defendant] w[as] 'not supposed to have.'" *Id.* at 1035. The court concluded that "one can reasonably assume . . . that [the officer's] request here concerned a search for weapons and narcotics. Therefore, realizing that [a second officer] was looking for weapons and narcotics, the reasonable person would expect him to search the trunk and look under loose carpet." *Id.*

The rule in the Fifth Circuit is basically the same. The context of the request to investigate and the subsequent consent control the reasonableness of the search. *United States v. Rich*, 992 F.2d 502, 506 (5th Cir.1993). In *Rich*, the Fifth Circuit addressed a question similar to the issue in *McWeeney*. The officer asked Rich for permission to "have a look in" his car, which Rich argued was not the same as asking permission to search. *Id.* at 503. The Court, while refusing to dictate the specific language to be used by officers requesting consent, did take the opportunity in *Rich* to establish certain guidelines:

> . . . it is not necessary for an officer to specifically use the term "search" when he requests consent from an individual to search a vehicle. *We hold that any words, when viewed in context, that objectively communicate to a reasonable individual that the officer is requesting permission to examine the vehicle and its contents constitute a valid search request for Fourth Amendment purposes.* Thus, in light of the factual cir-

cumstances in this case, we hold that [the trooper's] request to have "a look in" Rich's truck effectively communicated to Rich that [the trooper] was asking to search the vehicle.

*Id.* at 506 (emphasis added). *See also United States v. McSween*, 53 F.3d 684, 687–88 (5th Cir.1995) (upholding an officer's search of the defendant's trunk when the defendant assented to officer's request to "look in" his vehicle); *United States v. McCann*, 465 F.2d 147, 158–59 (5th Cir. 1972) (finding that defendant had consented to a search of his vehicle when the officer had asked if defendant "would mind if he looked into defendant's car" and defendant answered no).

In this case, the context is clear. Trooper Olivarez' interest was in hidden contraband. His line of inquiry leaves no doubt as to the context. A summary of his pertinent inquiry is as follows:

Q: Do you have anything illegal in the vehicle?

A: Excuse me?

Q: Do you have anything illegal inside the vehicle?

A: No, no sir.

Q: Marihuana?

A: No, sir

Q: Cocaine? Methamphetamine? Pills? Illegal pills? Illegal weapons? Money in more than ten thousand dollars which you have not declared?

A: No sir.

Q: No? Do you give me permission to search ("revisar") the vehicle?

A: Yes, yes.

Q: Have you done any repairs or anything like that?

A: No, nothing.

Q: How long have you had the vehicle?

A: Right now . . . well, we have, we have made the trip several times.

The context of this conversation makes clear that Trooper Olivarez was *not* asking to inspect the vehicle as someone would in a state-mandated annual safety inspection. The Defendant's suggestion is inherently unreasonable. While the argument perhaps sounds logical in a vacuum, it is clearly contrary to the existing circumstances in this case. As in *McWeeny*, the context of the conversation clearly demonstrates that Trooper Olivarez was interested in hidden contraband and all kinds of illegal substances and that he wanted to look for those substances. His question concerning repairs obviously portends his intention to closely investigate any potential alteration or addition. If one accepts the Defendant's suggestion that "revisar" translates as "inspect" rather than "search," the overall meaning in context remains the same. The trooper was clearly asking for permission to look throughout the car, including any recently repaired areas, for contraband.

This Court finds given the totality of the circumstances that Guerrero consented to the search of the Expedition and that Trooper Olivarez (and later the other trooper that aided him) did not exceed that consent.

**B. *The Defendant Did Not Object To The Scope Of The Search.***

The finding that a reasonable person would conclude that Guerrero consented to the search of the Ford is bolstered by the fact that he remained silent and made no effort to limit or curtail Olivarez's search. If, as the Defendant contends, he agreed to a mere inspection of the vehicle but not a search, he had ample opportunity to withdraw or limit his consent or point out to Trooper Olivarez that he had consented only to an "inspection," not a search. Guerrero never questioned the trooper's search, nor did he attempt to limit it in any way. For example, at one point Trooper Olivarez called his headquarters and then waited for additional help to dismantle the dashboard. If, as the Defendant contends he agreed solely to a safety inspection, this would have been the perfect time to bring that fact to the trooper's attention.

In such circumstances, a failure to object is properly considered " 'an indication that the search was within the scope of the initial consent.' " *McSween*, 53 F.3d at 688 (quoting *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir.1994)). A defendant has the responsibility to limit the scope of the request. *Id.* For example, "[p]olice do not have to separately request permission to search each closed container in a vehicle, and that the driver's general consent to search a car includes consent to examine a paper bag on the floor of the car." *United States v. Crain*, 33 F.3d 480, 484 (5th Cir.1994) (citing *Florida v. Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801). *See also United States v. Gordon*, 173 F.3d 761, 766 (10th Cir.1999) (emphasizing that "a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent" and upholding a search of a locked bag when the defendant did not object to the scope of the search).

Guerrero's silence (or failure to raise an objection to Trooper Olivarez) while the search, in Guerrero's full view, progressed beyond a mere safety inspection severely undermines his current argument that he either did not consent or only gave limited consent to search.

**C. *Assuming Arguendo That The Search Exceeded The Consent. Trooper Olivarez Acted In Good Faith, Negating The Need To Exclude The Evidence.***

 Even if Trooper Olivarez's search exceeded the scope of the consent given,

the evidence he discovered is covered by the "good faith" exception to the exclusionary rule. The Supreme Court has emphasized that the purpose of the exclusionary rule is narrow: "Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search. The rule's sole purpose ... is to deter future Fourth Amendment violations." *Davis v. United States*, — U.S. ——, 131 S.Ct. 2419, 2426, 180 L.Ed.2d 285 (2011) (citations omitted). Therefore, "where suppression fails to yield appreciable deterrence, exclusion is clearly ... unwarranted." *Id.* at 2426–27. The deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" under consideration. *Herring v. United States*, 555 U.S. 135, 143, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). When police act in "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the "deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* at 144, 129 S.Ct. 695. On the other hand, when police act with "an objectively 'reasonable good-faith belief' that their conduct is lawful, ... 'the deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" *Davis*, 131 S.Ct. at 2427–28 (quoting *United States v. Leon*, 468 U.S. 897, 918, n. 6, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). In such cases, there is an exception to the exclusionary rule, and evidence discovered in a search that turns out to be invalid may nonetheless be admitted.

The Supreme Court has applied this good faith exception in several circumstances. In *Davis*, it held that evidence discovered in an unconstitutional search should not be suppressed when the officers had in good faith relied on then-binding circuit precedent (which was later overturned) in conducting the search. *Davis*, 131 S.Ct. at 2432. In *Leon*, the Court

applied the good faith exception to searches conducted pursuant to warrants "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," even if the warrant turns out to be invalid. *Leon*, 468 U.S. at 920–21, 104 S.Ct. 3405. Most relevant to this case, the Supreme Court, in *Illinois v. Rodriguez*, found that the exclusionary rule should not apply to evidence obtained in a search of an apartment for which officers reasonably believed, although erroneously, that they had consent from someone with authority over the premises. *Illinois v. Rodriguez*, 497 U.S. at 188–89, 110 S.Ct. 2793. The Court emphasized that "if the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises" and the officer initiated the search based on that belief, the search is valid. *Id.*

The Fifth Circuit has also adopted a good faith exception to the exclusionary rule. In *United States v. Williams*, 622 F.2d 830 (5th Cir.1980), some three decades prior to the Supreme Court's decision in *Davis*, an en banc court wrote:

> Sitting en banc, we now hold that evidence is not to be suppressed under the exclusionary rule where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized. We do so because the exclusionary rule exists to deter willful or flagrant actions by police, not reasonable, good-faith ones. Where the reason for the rule ceases, it application must cease also. The costs to society of applying the rule beyond the purposes it exists to serve are simply too high....

*Williams*, 622 F.2d at 840. In *Williams*, the court upheld the arrest and subsequent search of a woman who the officer in

good faith believed was committing illegal bail violations. *Id.* at 846. Since *Williams,* the Fifth Circuit has routinely applied this rule in various settings, including vehicle searches. For example, in *United States v. De Leon–Reyna,* the court refused to exclude evidence found in a search following a contested traffic stop. 930 F.2d 396, 399 (5th Cir.1991). Citing *Illinois v. Rodriguez* for the proposition that a "search would be valid if the officers' belief that they had consent, in light of all the circumstances, was objectively reasonable,". the Fifth Circuit applied the good faith exception to the exclusionary rule because the officer initiated the stop based on a good faith (but mistaken) belief that the license plate number belonged to a stolen vehicle. *Id.*

A factually similar example from another circuit is *United States v. Sanchez,* where at a truck weigh-station an officer attempted to converse with driver, Chaviano, only to be told by passenger Sanchez that Chaviano did not speak English. 32 F.3d 1330, 1332 (8th Cir.1994). Sanchez volunteered to interpret. *Id.* The officer then gave Sanchez a standard consent form and asked him to explain it to Chaviano, noting that both Sanchez and Chaviano would have to sign. *Id.* The officer watched as Sanchez conversed with Chaviano in a foreign language, after which Chaviano signed the form and then Sanchez signed as a witness. *Id.* Chaviano and Sanchez later challenged the search made pursuant to this consent arguing that in fact Chaviano had never understood what was going on and thus "could not voluntarily have consented." *Id.* at 1335. The court responded that it was unnecessary to determine if there was actual consent, for it sufficed that the officer "reasonably believed that Chaviano voluntarily consented"; the court noted that several other circuits had ruled the same way. *Id.*

In the instant case, Trooper Olivarez certainly believed in good faith that he had consent to search the Defendant's vehicle. He asked Guerrero if he had any drugs or other illegal items in his car and then asked for consent to "revisar" the vehicle, to which Guerrero consented. The context of the request clearly supports a finding that Trooper Olivarez had a good faith belief that the search was consensual. As discussed above, this belief was objectively reasonable and was no doubt reinforced by the failure of the Defendant to object. Consequently, there is no reason for the exclusionary rule to apply to this case. This Court holds that, even if one assumes that Guerrero only gave consent to a safety inspection of the car, Trooper Olivarez had a good faith belief that he could search the totality of the vehicle. As such, the Motion to Suppress is **DENIED.**

**D.** ***There Is A Danger Of Focusing On One Word Defined By One Source Versus An Entire Conversation.***

The primary argument posed by the Motion to Suppress and the primary focus of the actual suppression hearing, itself, was on the Spanish–to–English translation of the verb "revisar." This Court's holding, as described above, effectively moots this argument, as it finds from a totality of the circumstances that Guerrero consented to, and made no attempt to limit, the search and that the search was certainly the result of Trooper Olivarez' good faith belief that he had permission. Yet, in fairness to the Defendant, this Court feels compelled to directly address the translation/vocabulary issue.

The Court for purposes of this motion has accepted that at least one meaning of "revisar" is "to inspect," as his counsel argued based on the *Simon and Schuster's International Dictionary.* (Again,

one should note there is no testimony from the Defendant as to how he personally understood the meaning of the word "revisar.") The danger of reliance upon one source or translation, such as a single dictionary, immediately became obvious when this Court's interpreter automatically and consistently translated the word "revisar" as "search," while the Defendant's counsel insisted otherwise. This Court has researched and found, among many, the following translations of "revisar" in alphabetical order: to audit, to check, to check over, to clear, to examine, to go into, to go over, to go over again, to go through, to inspect, to look, to look through, to overhaul, to probe, to review, to revise, to scrutinize, to search, to service, and to verify.

This review was neither scientific nor exhaustive, nor was it meant to be. The purpose was to show the variety of ways that one word has been translated or used. The word "revisar" was used by Trooper Olivarez because it was prescribed by the Department of Public Safety Headquarters. Perhaps that word was adopted because a prior Fifth Circuit opinion questioned the usage of the word previously prescribed by the DPS for its officers— "registrar":

> Because we find that DPS had probable cause to search Appellant's vehicle, we do not reach the Government's argument that Trooper Dollar had an objectively reasonable, good faith belief that Appellant voluntarily consented to search. *See, e.g., United States v. Williams*, 622 F.2d 830, 844–46 (5th Cir. 1980) (en banc) (per curiam) (discussing the good faith exception to the exclusionary rule). We are concerned that

DPS chooses to use the word "registrar" when asking for consent to search. While "registrar" is technically a correct interpretation of "search," it has potential to be very confusing. This is especially true in the context of a vehicle stop, because "registrar" is more commonly interpreted as "to register." We are troubled by the Government's position that a law enforcement officer may rely on this potentially confusing term to uphold a search of a Spanish speaker's property.

*United States v. Banuelos–Romero*, 597 F.3d 763, 769 n. 2 (5th Cir.2010).

Writers on the subject of translation have recognized similar difficulties: "Some of the most common English–Spanish legal dictionaries are partially useful, but they fail to offer critical information necessary to individuals to seek meaning and context for the terms and terms of art essential to inter-American legal practice." Daniel Kim–Prieto. *En la Tierra del Ciego, el Tuerco es Rev: Problems with Current English Spanish Legal Dictionaries, and Notes Toward a Critical Comparative Legal Lexicography*, 100 Law Libr. J. 251, 251 (2008). In this article, the author suggests that "[c]orrect translation presupposes careful analysis of the contexts where the terms are used." *Id.* at 257. Furthermore, to put too much weight on a single source would not only lead one to ignore context, but would also lead one to unreasonably omit consideration of other, perhaps very relevant, meanings.[3] These problems are not limited to legal jargon. This case provides a perfect study for the reason one must rely on context. Other examples are readily available. For example, some individuals might suggest the word "buscar" as a reasonable word for an

---

**3.** Kim–Prieto quotes an old Spanish (and English) saying to the effect that "in the land of the blind, the one-eyed man is king," and then suggests that in the universe of English–Span-

ish legal dictionaries there are many "one-eyed kings" which "fail to offer critical information necessary to individuals seeking meaning and context...." *Id.*

officer to use for "search." While "buscar" might accurately be translated as "to search," many others might argue that its use in everyday conversation is when one searches "for" something, as when one looks for his lost car keys. To those individuals, "revisar" may be more appropriate if one means to search "in" something, and thus "revisar" would be appropriate for one who wishes to search a car. Thus, context becomes the pivotal factor.

This discussion explains one ruling, and one non-ruling, that this Court made in regard to this Motion to Suppress. First of all, while allowing the Defendant to use *Simon and Schuster's International Dictionary* definition (Defendant's Exhibit #3), the Court did not take judicial notice of same, there being no one, right way to interpret one Spanish verb out of context. Stated another way, under Federal Rule of Evidence 201, this is not an area "not subject to reasonable dispute." There is no "common knowledge" that one word has one meaning in all contexts. Second, it explains why this Court does not rely on that dictionary to outweigh the context and usage of the conversation between the two individuals in question and why it ordered that the exact conversation, which was recorded, be produced and introduced as evidence.

### Conclusion

The Motion to Suppress is hereby **DENIED.** It is clear from all of the facts, circumstances, and context of the dialogue between the trooper and the Defendant that the trooper asked for and received permission to search the car. Alternatively, this Court finds that, even if one assumes hypothetically that permission was not given, Trooper Olivarez in good faith thought he had consent to search the car.