*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-0210

MARCUS C. FORD, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2016-CF2-002959)

(Hon. Patricia A. Broderick, Trial Judge)

(Argued April 5, 2022                                    Decided July 31, 2025)

*Gregory M. Lipper* for appellant.

*Daniel Lenerz*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time of argument, and *Chrisellen R. Kolb, Elizabeth Gabriel,* and *Ethan Carroll*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, *Associate Judge*, and RUIZ[*] and GLICKMAN,[†] *Senior Judges*.

---

[*] Senior Judge Fisher was originally assigned to this case. Following Judge Fisher's retirement, effective August 22, 2024, Judge Ruiz was assigned to take his place on the panel.

[†] Judge Glickman was an Associate Judge of the court at the time of argument. He began his service as a senior judge on December 21, 2022.

BECKWITH, *Associate Judge*: Marcus Ford was charged with several drug-related offenses after four officers who were canvassing the hallways of his apartment building seized a vial of PCP and multiple baggies of cocaine from inside his pants pocket after encountering him at an entrance to a stairwell. Mr. Ford moved to suppress the evidence, arguing that although he initially said "yes" when Officer Justin Branson asked to "search" or "check" him, he withdrew that consent by putting his hand on his pocket as the officer was touching what he described as a suspicious bulge in that pocket. The trial court denied the motion, finding that the encounter remained consensual throughout, until the ultimate seizure of drugs from Mr. Ford's pocket. In Mr. Ford's first appeal to this court, we concluded that the "trial court erred as a matter of law in ruling that Mr. Ford's actions did not revoke consent," and we remanded to "allow the trial court to render additional findings and conclusions as to whether the officer had a lawful basis for searching Mr. Ford's pocket." *Ford v. United States*, 245 A.3d 977, 980-81, 986 (D.C. 2021) (*Ford I*).

On remand, the trial court issued supplemental findings concluding that the search of Mr. Ford's pocket that occurred after Mr. Ford revoked his consent was supported by probable cause. In addition to the officers' experience, the known drug activity—and specifically PCP use—in Mr. Ford's apartment complex, and Mr. Ford's "unnatural and weird" movements as he sought to let the officers pass by him, the court relied upon its finding that Officer Branson felt "confident" that the object

was a vial of PCP "based on Defendant's reaction, specifically the fearfulness and the grabbing of his pocket." According to the trial court, "[w]hen Defendant grabbed his pocket and Officer Branson's hand to stop the search, he was—as the Court of Appeals has ruled—revoking his consent" but he was also "simultaneously confirming the officer's well-founded observations and conclusions that his pocket contained a glass vial of PCP." Near the end of its supplemental findings, in its only specific reference to any exception to the warrant requirement that might apply to the no-longer-consensual search of Mr. Ford's pocket, the court concluded that the officer's "experience, knowledge, and the 'plain feel' test were more than sufficient to reach probable cause under the circumstances." Despite its mention of the "plain feel test"—one of the exceptions to the Fourth Amendment's requirement that searches and seizures by law enforcement be authorized by a warrant issued by a judge and based on probable cause[1]—the court did not lay out or specifically apply the actual requirements of that doctrine.

---

[1] Searches and seizures that are "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Thompson v. Louisiana*, 469 U.S. 17, 19-20 (1984)).

In this appeal from the second denial of his motion to suppress, Mr. Ford argues that the trial court erred when it considered his revocation of consent as support for probable cause and that absent this unlawful consideration, the police lacked authority to search Mr. Ford's pocket and seize the drugs that formed the basis of his convictions. We agree and therefore vacate Mr. Ford's convictions.[2]

## I.

When reviewing the denial of a motion to suppress, we "defer[] to the trial court's findings of fact, unless they are clearly erroneous or not supported by the record." *Ball v. United States*, 803 A.2d 971, 974 (D.C. 2002). "We review de novo the trial court's conclusions of law," including its probable-cause determination. *Sharp v. United States*, 132 A.3d 161, 166 (D.C. 2016). "The test for judging the existence of probable cause is whether a reasonably prudent police officer, considering the total circumstances confronting him and drawing from his experience, would be warranted in the belief that an offense has been or is being committed." *Ball*, 803 A.2d at 974 (quoting *Peterkin v. United States*, 281 A.2d

---

[2] Mr. Ford also argues that the trial court abused its discretion in summarily denying the motion to suppress without giving the parties the opportunity to be heard and without addressing contradictory evidence in the record. Because we reverse the trial court's ruling on the merits, we do not address Mr. Ford's other arguments.

567, 568 (D.C. 1971)).

The government argues that the seizure of drugs from Mr. Ford's pocket was authorized by the plain feel doctrine, which allows police to conduct a warrantless seizure of evidence that officers physically touched in the course of an otherwise lawful frisk or search as long as "the incriminating nature of the object perceived to be contraband . . . [was] immediately apparent to the officer." *Id*. at 975; *Maye v. United States*, 314 A.3d 1244, 1257 (D.C. 2024). Here, where the object in question undisputedly had innocent as well as unlawful uses, where the trial court called this a "very close case" as to probable cause, and where the judge noted that it would be "a better case for the government" if "we had a nice, hard rock or something obviously easily identified as drugs," the vial in Mr. Ford's pocket was not the sort of object whose "incriminating character" was "immediately apparent" to the officer. *Minnesota*, 508 U.S. at 375. This is complicated by this court's previous application of the plain feel doctrine. In *Ball*, we adopted a contextual approach to cases involving an officer's seizure of a container, like the glass vial at issue here, "that is not in itself contraband and does not conform to the shape of contraband . . . yet is known to be routinely used to package or contain drugs." 803 A.2d at 976. Under that approach, the court may consider the officer's training and experience and other attendant circumstances in evaluating the officer's tactile perception of the immediately apparent incriminating nature of the object in question. *Id.* at 978 (D.C.

2002).[3]

In *Ball*, we applied the plain feel doctrine and affirmed the denial of a motion to suppress where an officer felt a medicine bottle in the defendant's pants pocket.[4] 803 A.2d at 981-82. Among the circumstances supporting the probable-cause determination was the officer's testimony that he had "arrested numerous people who have hidden narcotics in medicine bottles" and that the defendant had tried to cover his abdomen immediately upon encountering the officer. *Id*. at 981. But the "most important" consideration was the defendant's repeated efforts to reach into his right front pocket—the exact place where the officer ultimately detected the medicine bottle—"in derogation of the officer's specific orders to keep his hand out of the pocket." *Id*.

---

[3] Other courts that have declined to adopt this contextual approach have held that the seizure of not-readily-identifiable hard objects does not satisfy the requirements of the plain feel doctrine. *See, e.g.*, *Ex Parte Warren*, 783 So.2d 86, 94-95 (Ala. 2000) (holding that a seizure of a Tic-Tac container was not justified under the plain feel doctrine of *Minnesota v. Dickerson*); *Commonwealth v. Guillespie*, 745 A.2d 654, 659 (Pa. Super. Ct. 2000) (holding that the seizure of several pill bottles from the defendant's pocket was not authorized by the plain feel doctrine where the bottles were not in a suspicious location on the defendant's body and "it was not immediately apparent that the objects in [the defendant's] pockets were incriminatingly indicative of the presence of contraband").

[4] After the officer removed the medicine bottle from the defendant's pocket, he opened it and "saw a large number of ziplock bags containing a white rock-like substance." *Ball*, 803 A.2d at 973.

Here, like in *Ball*, the trial court based its probable-cause determination in part on Mr. Ford's gesture towards his pocket, characterizing the gesture as a fact that "confirm[ed]" Officer Branson's belief that the container he felt in Mr. Ford's pocket was in fact "a glass vial of PCP." But where in *Ball*, the suspicious gesture was in defiance of specific orders, *id.*, in the present case, the evasive move was Mr. Ford's effort to revoke his consent to the search—evidence that was not properly considered as part of the probable cause calculation. As we stated in *Ford I*, "[a]fter a suspect gives free and voluntary consent to be searched, a suspect 'may of course delimit as he chooses the scope of the search to which he consents.'" 245 A.3d at 984 (quoting *Burton v. United States*, 657 A.2d 741, 746 (D.C. 1994)). *See also United States v. Wilson*, 953 F.2d 116, 126 (4th Cir. 1991) (if "police were permitted to disregard a suspect's attempts to ignore further questioning and to persist until 'reasonable suspicion' was created or consent given, the Fourth Amendment would be greatly diminished in its intended role as the bulwark against 'overbearing or harassing' police conduct") (quoting *Terry v. Ohio*, 392 U.S. 1, 15 (1968)). This "constitutional right to withdraw one's consent to a search . . . would be of little value if the very fact of choosing to exercise that right could serve as any part of the basis for finding the reasonable suspicion"—or similarly the probable cause—"that makes consent unnecessary." *United States v. Carter*, 985 F.2d 1095, 1097 (D.C. Cir. 1993)

(citation omitted).[5]

Consent is an exception to the warrant requirement that the government invokes to justify an otherwise warrantless search or seizure. But consent goes only so far—a suspect can limit its scope ("you can search my house but not my room") or revoke it completely. *See*, *e.g.*, *United States v. McWeeney*, 454 F.3d 1030, 1036

---

[5] *See also United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir. 1978) (concluding that it would be an "unfair and impermissible burden" on an individual's right to refuse to be searched if the government could use the refusal against them.); *United States v. Alexander*, 835 F.2d 1406, 1409 n.3 (11th Cir. 1988) ("[W]e note that a defendant's refusal to consent to a search cannot establish probable cause to search. A contrary rule would vitiate the protections of the Fourth Amendment."); *United States v. White*, 890 F.2d 1413, 1417 n.4 (8th Cir. 1989) (Police "cannot use [a defendant's] refusal to consent to the search of his bags as support for the requisite reasonable articulable suspicion."); *State v. Young*, 228 P.3d 441 (Kan. Ct. App. 2010) (unpublished table decision) ("[T]he fact that [the defendant] withdrew her consent for [the officer] to search her home cannot be used to formulate reasonable suspicion."); *United States v. Hyppolite*, 65 F.3d 1151, 1157 (4th Cir. 1995) ("[A]n objectively reasonable officer should have known that the mere assertion of constitutional rights cannot establish probable cause."); *Elson v. State*, 659 P.2d 1195, 1199 (Alaska 1983) (Evidence of a refusal to consent to either a legal or illegal search is inadmissible because admitting such evidence would "inhibit individuals from exercising the right to refuse consent."); *State v. Clemmons*, 86 P.3d 1026 (Kan. Ct. App. 2004) ("Courts have consistently held that the fact that an individual refused to consent to a search may not be considered in formulating reasonable suspicion."); *cf. Brown v. United States*, 590 A.2d 1008, 1019 (D.C. 1991) ("To say that a citizen is free to leave without responding to the officer's questions . . . is meaningless if the exercise of that freedom generates authority for a seizure where none previously existed.") (citation omitted); *Robinson v. United States*, 76 A.3d 329, 338 (D.C. 2013) ("[O]ur 'recognition that citizens have no legal duty to speak to the police would be rendered meaningless if the failure to cooperate were held to be a legitimate ground to conduct an investigatory stop.'") (quoting *Duhart v. United States*, 589 A.2d 895, 901 (D.C. 1991)).

(9th Cir. 2006) (remanding for trial court to "determine whether the officers created a setting in which the reasonable person would believe that he or she had no authority to limit or withdraw their consent"). It is the exercise of these rights—the right not to consent, the right to limit the scope of the consent, the right to revoke the consent—that cannot be used against the person exercising them. If a suspect's exercise of his right to deny consent to search a particular room gave police probable cause to search that room, or if his withdrawal of consent gave police grounds to seize items from pockets or containers the suspect changed his mind about letting police search, the right would be of little worth. When we start from the premise that a consented-to search is already a deviation from the warrant requirement, we can better grasp the illogic of including a suspect's withdrawal of consent in the totality-of-the-circumstances assessment of probable cause. [6]

---

[6] This is not to say that the subsequent revocation of consent may not inform other determinations. For example, some courts have held that a revocation of consent can be considered as one factor in the fact-intensive determination of whether a defendant's initial consent was voluntarily given. *See, e.g., United States v. Elie*, 111 F.3d 1135, 1146 (4th Cir. 1997) ("By revoking his consent to search certain documents in his rooms, [the defendant] conclusively demonstrated that he knew of his right to refuse consent."); *United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004) (concluding that the defendant's "detention remained consensual prior to the canine alert" because "after the canine alerted, [the defendant] affirmatively asked to terminate the encounter, undermining his claim that he felt unable to revoke his consent"). *See also Wilson*, 953 F.2d at 126 (declining to hold that "the form of a denial can *never* be included as a factor to be considered in determining whether an investigative stop was justified").

With Mr. Ford's revocation of consent properly excluded as a consideration, the ultimate seizure of the drugs from Mr. Ford's pocket was not justified under the plain feel exception to the warrant requirement. As noted above, the trial court was less than clear in even applying the plain feel doctrine, and it did not find that it would have been objectively reasonable for Officer Branson to believe that he was touching a glass vial of PCP. According to the trial court's findings, the incriminating nature of the object was not *immediately* apparent to Officer Branson, who touched Mr. Ford's pocket and then "almost immediately" confirmed that Mr. Ford had a glass vial consistent with PCP, his confidence based on the impermissible consideration of Mr. Ford's "reaction, specifically the fearfulness and the grabbing of his pocket."

In the end, a comparison to *Ball* is again helpful. There, we acknowledged that there were "fewer circumstances attendant to the officer's tactile identification of the medicine bottle" than in other cases from this court. 803 A.2d at 981. The trial court here likewise viewed the probable cause question as very close. And in both *Ball* and this case, the trial court weighed similar facts in support of probable cause—facts about the suspect's nervousness and suspicious gestures and the officers' experience and knowledge of the criminal activity in the area where the

arrest occurred.[7] In *Ball*, these facts and, "most important," the defendant's evasive moves in trying to access the pocket containing the medicine bottle several times after being instructed not to were enough to get over the probable-cause line. *Id*. at 981-82. In the absence of a critical factor like this, and in the absence of the consent revocation evidence that gave Officer Branson his confidence that what he felt in Mr. Ford's pocket was contraband, there is not enough left here among the attendant

---

[7] The trial court gave significant weight to the fact that the officer "was familiar with the drug trafficking in the area and had specifically seen signs of ongoing drug trafficking in the building [in] which he encountered" Mr. Ford. While "evidence that other people have committed crimes in an area" is often relevant when deciding whether an individual's action are suspicious, we have warned against overreliance on this consideration. *Mayo v. United States*, 315 A.3d 606, 632-34 (D.C. 2024) (en banc). Here, where law enforcement did not have any particularized suspicion from a tip, see *Dickerson v. United States*, 677 A.2d 509, 511 (D.C. 1996), or otherwise have reason beforehand to believe that Mr. Ford himself was involved with illegal drugs, we accord minimal weight to the officer's observations about drug trafficking in the area. The trial court's finding that Mr. Ford acted nervously—oddly turning his body away from the four officers when he unexpectedly crossed paths with them as he was entering the stairwell that they were about to enter—is also relevant to probable cause. But Mr. Ford did not run or flee, and instead cooperated with the officers. *See Brown v. United States*, 590 A.2d 1008, 1020 (D.C. 1991) ("Brown's brief attempt to exercise his right not to participate in an encounter with [the officer] . . . did not constitute the kind of conduct on the scene that could significantly bolster the government's showing of probable cause . . . ."); *Ball*, 803 A.2d at 981 ("[A] furtive gesture is not sufficient standing alone to provide probable cause to believe a crime is being or has just been committed." (internal quotation marks omitted)). And the trial court's finding that Officer Branson said "his original intent was not to search Defendant, but just to pass by Defendant" suggests that the bulge in Mr. Ford's pocket and the strange pivot did not persuade the officer himself that he should search Mr. Ford in the absence of consent. So while these findings do contribute to the bases for suspicion, they are not sufficient to demonstrate probable cause to believe Mr. Ford had been or was committing a crime.

circumstances to support probable cause under the plain feel exception to the warrant requirement. *See id.* ("[T]rial courts must be careful to assure that a police officer's 'immediately apparent' recognition of a concealed drug package . . . is not too casually claimed or accepted.'" (quoting *Dickerson*, 677 A.2d at 512)).

## II.

For the foregoing reasons, we reverse the trial court's denial of Mr. Ford's suppression motion, vacate his convictions, and remand for further proceedings consistent with this opinion.

*So ordered.*